FILED
April 22, 2015
Third Court of Appeals
Jeffrey D. Kyle
Clerk

No. 03-14-00340-CV

## IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

**APPELLANTS, CPS ENERGY, TIME WARNER CABLE TEXAS LLC, AND SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T// CROSS-APPELLANT, PUBLIC UTILITY COMMISSION OF TEXAS**

**V.**

**APPELLEE, PUBLIC UTILITY COMMISSION OF TEXAS// CROSS-APPELLEE, CPS ENERGY, TIME WARNER CABLE TEXAS LLC AND SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T**

On appeal from D-1-GN-13-001238 (Consolidated)
in the 250th Judicial District Court, Travis County, Texas

## CPS ENERGY'S BENCH NOTEBOOK

**CPS ENERGY**

Curt D. Brockmann
cdbrockmann@cpsenergy.com

145 Navarro
P.O. Box 1771
San Antonio, Texas 78296
(210) 353-5689 (Voice)
(210) 353-6832 (Facsimile)

**HERRERA & BOYLE, PLLC**

Alfred R. Herrera
State Bar No. 09529600
aherrera@herreraboylelaw.com

816 Congress Avenue, Suite 1250
Austin, Texas 78701
(512) 474-1492 (Voice)
(512) 474-2507 (Facsimile)

**April 22, 2015**

No. 03-14-00340-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

APPELLANTS, CPS ENERGY, TIME WARNER CABLE TEXAS LLC,
AND SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T//
CROSS-APPELLANT, PUBLIC UTILITY COMMISSION OF TEXAS

V.

APPELLEE, PUBLIC UTILITY COMMISSION OF TEXAS// CROSS-
APPELLEE, CPS ENERGY, TIME WARNER CABLE TEXAS LLC AND
SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T.

On appeal from D-1-GN-13-001238 (Consolidated)
in the 250th Judicial District Court, Travis County, Texas

CPS ENERGY'S BENCH NOTEBOOK

**CPS ENERGY**

Curt D. Brockmann
cdbrockmann@cpsenergy.com

145 Navarro
P.O. Box 1771
San Antonio, Texas 78296
(210) 353-5689 (Voice)
(210) 353-6832 (Facsimile)

**HERRERA & BOYLE, PLLC**

Alfred R. Herrera
State Bar No. 09529600
aherrera@herreraboylelaw.com

816 Congress Avenue, Suite 1250
Austin, Texas 78701
(512) 474-1492 (Voice)
(512) 474-2507 (Facsimile)

**April 22, 2015**

**TAB 1**

### V.T.C.A., Transportation Code § 311.001
### § 311.001. General Authority of Home-Rule Municipality
### Effective: June 19, 2009

(a) A home-rule municipality has exclusive control over and under the public highways, streets, and alleys of the municipality.

(b) The municipality may:

(1) control, regulate, or remove an encroachment or obstruction on a public street or alley of the municipality;

(2) open or change a public street or alley of the municipality; or

(3) improve a public highway, street, or alley of the municipality.

(c) Notwithstanding Subsection (a) or (b) or Section 311.007, before a municipality with a population of 1.9 million or more may install traffic calming measures within the municipality, the governing body of the municipality must:

(1) publish standards and criteria, which must include sufficient notice to allow the governing body to receive and consider public comments from residents within one-half mile of the proposed traffic calming measure;

(2) on request of affected residents, schedule and hold a public meeting before implementation of the measure; and

(3) if the measure involves the closure of a street to motor vehicular traffic, before the closure:

(A) hold a public hearing on the issue of the closure; and

(B) approve the closure by a majority vote.

**TAB 2**

V.T.C.A., Government Code § 1502.001
§ 1502.001. Definitions

In this chapter:

(1) "Combined system" means any combination of one or more of the following:

    (A) an electric system;

    (B) a water system;

    (C) a sewer system;

    (D) a solid waste disposal system;

    (E) a drainage utility system; and

    (F) a natural gas system.

(2) "Public security" has the meaning assigned by Section 1201.002.

(3) "Utility system" means an electric, water, sewer, solid waste disposal, drainage utility, or natural gas system. The term includes one or more combined systems.

**TAB 3**

## V.T.C.A., Government Code § 1502.070
### § 1502.070. Management and Control of Utility System
Effective: May 18, 2013

(a) Management and control of a utility system may be vested in:

(1) the municipality's governing body; or

(2) a board of trustees named in the proceedings adopted by the municipality and consisting of not more than:

(A) five members, one of whom must be the mayor of the municipality;

(B) seven members, one of whom must be the mayor of the municipality, if the municipality is located in a county:

(i) with a population of at least 800,000; and

(ii) that is located on an international border; or

(C) seven members, one of whom must be the mayor of the municipality, if the municipality is located in a county:

(i) with a population of at least 375,000;

(ii) that is located on an international border; and

(iii) that borders the Gulf of Mexico.

(b) The compensation of the trustees shall be specified by the proceedings. The compensation may not exceed five percent of the gross receipts of the utility system in any year.

(c) The proceedings of the municipality may specify the terms of office of the board of trustees, their powers and duties, the manner of exercising those powers and duties, the election of successor trustees, and any matter relating to the organization and duties of the board. On any matter not covered by the proceedings, the board of trustees is governed by the laws and rules governing the municipality's governing body, to the extent applicable.

4

**TAB 4**



**TEX. GOV'T CODE § 1502.070**

**CITY OF SAN ANTONIO**

City Council Controls Rights of Way (ROWs)

ROW Agreements

ROW Agreements

at&t

TIME WARNER CABLE

Pole Attachment Agreement

Pole Attachment Agreement

**CPS ENERGY**

Governed by Independent Board of Trustees

Enter into Pole Attachment Agreements

**TAB 5**

**EXHIBIT A**



EXHIBIT

TWC-62

TAB 5

## POLE LICENSE AGREEMENT

This Agreement entered into this __20 TH__ day of __February__, 196?, by and between the City of San Antonio, Texas, acting through the City Public Service Board of San Antonio, a municipal board of said City, hereinafter called "Licensor" and Rogers Cablesystems of Texas, Inc. hereinafter called "Licensee."

### W I T N E S S E T H :

In consideration of the mutual covenants, terms and conditions herein contained, the parties hereto do hereby mutually covenant and agree as follows:

### DEFINITIONS

1. As used in this Agreement:

   "Licensor's poles" means electric distribution system utility poles owned by Licensor.

   "Licensee's facilities" means Licensee's cables, wires, supporting strand, brackets, drop wires, tapoffs, line amplifiers, power supplies and other equipment used in connection with the operation of Licensee's community antenna television system.

   "Joint User" means any public utility, governmental body, or other entity which owns poles to which Licensor is extended joint use attachment privileges and to whom Licensor has extended joint use attachment privileges of Licensor's poles.

   "Other Licensee" means any entity, other than Licensee herein or a Joint User, to whom Licensor has or hereafter shall extend the privilege of attaching facilities to Licensor's poles.

### LICENSE

2. Licensor agrees to grant to Licensee, to the extent it may lawfully do so and subject to the terms and conditions of this Agreement, revocable, nonexclusive licenses to attach portions of Licensee's facilities to Licensor's poles, where reasonably available and where such use will not interfere with Licensor's service requirements or the use of its facilities by others. This License is for the provision of Licensee's community antenna television service within those portions of the Licensor's service area in which the Licensee has been franchised by appropriate authorities. Licensee hereby agrees to be bound by the terms and conditions hereof.

### ATTACHMENT PERMITS AND BILLING

3. Prior to making any attachment applications hereunder, Licensee shall obtain, and upon request shall submit to Licensor, evidence, satisfactory to Licensor, of a franchise or other authority authorizing Licensee to erect and maintain for the purposes set out in Section 2 hereof, its facilities within the public streets, highways, alleys, utility easements, other thoroughfares, and on private property situated in Licensor's service area, and of any other necessary consent

6

**TAB 6**

# Attachment 2

# Joint Use Pole Contact Agreement



EXHIBIT

TWC-63

48

TAB 6

B. LESSOR, Joint Users and OTHER LESSEES reserve the right to utilize and/or maintain LESSOR'S poles and to operate their facilities thereon in such manner as will best enable them to fulfill their service requirements.

## ARTICLE VI - RIGHTS OF WAY FOR LESSEE'S ATTACHMENTS

While the LESSOR and the LESSEE will cooperate as far as may be practicable in obtaining rights of way for both parties on joint poles, no guarantee is given by the LESSOR of permission from property owners, municipalities or others for the use of its poles by the LESSEE, and if objection is made thereto and the LESSEE is unable satisfactorily to adjust the matter within a reasonable time, the LESSOR may at any time upon sixty (60) days notice in writing to the LESSEE, require the LESSEE to remove its attachments from the poles involved; and the LESSEE shall, within six months after receipt of said notice, remove its attachments from such poles at its sole expense.

## ARTICLE VII - INTERFERENCE

While it is not foreseen, should the LESSEE'S operations in any way interfere with LESSOR'S operational functions or needs or if LESSEE'S activities constitute disruption or interference, LESSOR shall have the right to immediately terminate the Agreement and LESSEE will be required to remove all equipment within a reasonable period of time at its sole cost.

## ARTICLE VIII - MAINTENANCE OF POLES AND ATTACHMENTS

The LESSOR shall maintain its joint poles in a safe and serviceable condition and in accordance with the specifications mentioned in Article III and shall replace said poles as they become defective. LESSEE'S rights under this

5

53



7

## Sec. 17.002. DEFINITIONS.

In this chapter:

(7) "Service provider" means any entity that offers a product or service to a customer and that directly or indirectly **charges to or collects** from a customer's bill an amount for the product or service on a customer's bill received from a billing utility.

## Sec. 31.002. DEFINITIONS.

In this subtitle: ...

(15) "Rate" includes a compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, **charged, or collected** by an electric utility for a service, product, or commodity described in the definition of electric utility in this section and a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification that must be approved by a regulatory authority.

## Sec. 39.302. DEFINITIONS.

In this subchapter:

(7) "Transition charges" means nonbypassable **amounts to be charged** for the use or availability of electric services, approved by the commission under a financing order to recover qualified costs, **that shall be collected by an electric utility, its successors, an assignee, or other collection agents as provided for in the financing order.**

## Sec. 41.002. DEFINITIONS.

In this chapter:

(2) "Rate" includes any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, **charged, or collected** by an electric cooperative for any service, product, or commodity and any rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification

## Sec. 64.002. DEFINITIONS.

In this chapter:

(5) "Service provider" means any entity that offers a product or service to a customer and that directly or indirectly **charges to or collects** from a customer's bill an amount for the product or service on a customer's bill received from a billing utility.

## Sec. 33.008. FRANCHISE CHARGES.

(b) If a municipality collected a charge or fee for a franchise to use a municipal street, alley, or public way from an electric utility, a municipally owned utility, or an electric cooperative ... is entitled to **collect from** each electric utility, transmission and distribution utility, municipally owned utility, or electric cooperative that uses the municipality's streets, alleys, or public ways to provide distribution service a charge based on each kilowatt hour of electricity delivered by the utility to each retail customer whose consuming facility's point of delivery is located within the municipality's boundaries.

## Sec. 36.403. STANDARDS AND PROCEDURES GOVERNING SECURITIZATION AND RECOVERY OF SYSTEM RESTORATION COSTS.

(f) For purposes of this subchapter, "transition charges," ... includes nonbypassable amounts to be charged for the use of electric services, approved by the commission under a financing order to recover system restoration costs, that shall be collected by an electric utility, its successors, an assignee, or other collection agents as provided for in the financing order. ...

## Sec. 55.176. CHARGE FOR 800-TYPE CALLS.

(g) The commission may not impose on a local exchange company the duty or obligation to: ...

(2) **bill or collect** for the use of the pay telephone; ...

(V.A.C.S. Art. 1446c-0, Sec. 3.2625(d).)

8

**TAB 8** - Substantial Evidence In Record Supporting PUCT's Finding That Actual Data Supports Average Number of Attaching Entities of Three

1.  "Unless attachers such as TWC have been making unauthorized attachments to CPS Energy poles, there is no sound basis to the position that billing data presents an inaccurate picture of the number of attachments." - *A. R. Part II of III, Binder 15, CPS Energy Ex. 18A, Rebuttal Testimony of Ricardo Lopez at 20:11-16.*

2.  "In this worst-case, hypothetical and unrealistic scenario, I took the smallest *possible* number of poles with CPS Energy and at least one attaching entity. ... I then **divided all billed attachments, plus all known COSA attachments, by this smallest number of possible joint use poles.**" - *A. R. Part II of III, Binder 16, CPS Energy Ex. 19B, Supplemental Rebuttal Testimony of Ricardo Lopez (Confidential) at 16:8-14.* [Emphasis added.]

3.  "The result of this worst-case calculation was 3.12 average attaching entities. Of this amount, COSA attachments represent 0.02 out of the 3.12 average number of attaching entities. This demonstrates that my original statement that **there is virtually no impact to including COSA attachments is accurate, even in the worst-case scenario.**" - *A. R. Part II of III, Binder 16, CPS Energy Ex. 19B, Supplemental Rebuttal Testimony of Ricardo Lopez (Confidential) at 17:5-10.* [Emphasis added.]

4.  "[A]ccording to CPS Energy GIS data, there are only 1,616 CPS Energy fiber attachments to distribution poles. Inclusion of CPS Energy fiber would only increase the worst-case theoretical maximum by 0.01 up to 3.13 average number of attaching entities." - *A. R. Part II of III, Binder 16, CPS Energy Ex. 19B, Supplemental Rebuttal Testimony of Ricardo Lopez (Confidential) at 17:19-18:2.*

5.  "COSA has approximately 1,240 street intersections with traffic signals within the city limit... Assuming four attachments to CPS Energy poles at each of these intersections produces 2,000 as the total number of COSA attachments for traffic cables." - *A.R. Binder Part II of III, Binder 15, CPS Energy Ex. 18B, Rebuttal Testimony of Ricardo Lopez (Confidential) at 21:10-18.*

6.  "Also COSA has installed approximately 500 cameras and 700 wi-fi antennas throughout the city limit ... This increases COSA's worst case total number of attachments on CPS Energy poles to approximately 3,200." - *A.R. Binder Part II of III, Binder 15, CPS Energy Ex. 18B, Rebuttal Testimony of Ricardo Lopez (Confidential) at 21:19-22:1.*

7.  "Adding the 3,200 attachments to the calculation for average number of attachers would change the number for the year 2007 from 2.23 to 2.24. ... As demonstrated by this exercise, **there is virtually no impact to including the COSA attachments.**" - *A. R. Part II of III, Binder 15, CPS Energy Ex. 18B, Rebuttal Testimony of Ricardo Lopez (Confidential) at 22:1-8.* [Emphasis added.]

---

8.  "[T]he total number of attachments for an entity such as AT&T or TWC does not change significantly from year to year." - *A.R. Part II of III, Binder 15, CPS Energy Ex. 18B, Rebuttal Testimony of Ricardo Lopez (Confidential) at 27:15-16.*

9.  "The most current calculation of pole attachments was performed in 2009 ...The validity of the original count [from 2000] is not in question because it is based on a statistically valid survey, and, moreover, the original count is constant for the most part. This establishes that the AT&T pole count is reasonably accurate and not a 'guess.'" - *A. R. Part II of III, Binder 15, CPS Energy Ex. 18B, Rebuttal Testimony of Ricardo Lopez (Confidential) at 27:18-24.*

10. "The only attachments with the greatest difference between billing data and field survey results, thus, are the AT&T attachments. The difference is due to the fact that they are based on a statistical sampling from 2000, but the difference is not significant." - *A.R. Part II of III, Binder 15, CPS Energy Ex. 18A, Rebuttal Testimony of Ricardo Lopez at 20:6-8.*

11. "Considering the magnitude of AT&T's original pole count from the 2000 sampling, and the fact that the only significant change to the pole count is the addition of new attachments, the most current calculated number of AT&T pole contacts is a reasonably accurate number. - *A.R. Part II of III, Binder 15, CPS Energy Ex. 18A, Rebuttal Testimony of Ricardo Lopez at 20:11-14.*

12. "More importantly, CPS Energy's average number of attaching entities is based on its actual data, and its actual data is further supported by a statistically valid survey. By contrast no party in this proceeding that is challenging CPS Energy's average number of attaching entities has come forward with any data to support a number different than what CPS Energy's actual data show." - *A. R. Part II of III, Binder 16, CPS Energy Ex. 19B, Supplemental Rebuttal Testimony of Ricardo Lopez (Confidential) at 20:12-20.*

13. "In Exhibit SSPAE-1, I provide the calculation for CPS Energy's maximum allowable pole attachment rates for test years 2004 through 2009 (billing years 2005 through 2010) using the prior Telecom Formula." *A. R. Part II of III, Binder 16, CPS Energy Ex. 20A, Second Supplemental Rebuttal Testimony of Paul A. Escamilla (Redacted) at 8:21-23.*

14. At Exhibit SSPAE-1: See tables (attached) showing year-by-year data used to calculate maximum allowable pole attachment rate. *A. R. Part II of III, Binder 16, CPS Energy Ex. 20B, Second Supplemental Rebuttal Testimony of Paul A. Escamilla (Confidential) at Exhibit SSPAE-1.*

15. "Information is received from the Overhead Engineering Department which details the quantities of pole contacts and the rate to be charged per contact to each entity that is attached to CPS Energy's poles. Staff within Current Asset

## TAB 8 - Substantial Evidence In Record Supporting PUCT's Finding That Actual Data Supports Average Number of Attaching Entities of Three

Management then prepares the invoices and records the billings in CPS Energy's SAP accounting system. The invoices are then printed out and mailed to the customers. The invoices for pole contacts are prepared on an annual basis." *A. R. Part II of III, Binder 14, CPS Energy Ex. 4, Direct Testimony of David J. Ramirez at 5:11-16.*

16. "Please see the attached spreadsheet ["Exhibit - Pole Contacts Summary"] which details the quantities of contacts, the rates and the amounts billed to each pole contact customer for the calendar years 2005 through 2009 inclusive." *A. R. Part II of III, Binder 14, CPS Energy Ex. 4, Direct Testimony of David J. Ramirez at 6:3-5.*

17. See attached, "Exhibit - Pole Contacts Summary" *A. R. Part II of III, Binder 14, CPS Energy Ex. 4, Direct Testimony of David J. Ramirez at 8-14.*